**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------- X

MATEO GUERRERO-TABARES

               Plaintiff,

      - against -

THE CITY OF NEW YORK; NYPD ASSISTANT
CHIEF JAMES MCCARTHY; NYPD SERGEANT
"FNU" BOYLE; NYPD OFFICER "FNU"
BLACK; AND NYPD MEMBERS JOHN AND
JANE DOES NOS. 1-3

             Defendant(s)

---------------------------------------------------------------- X

Case No.


**COMPLAINT**

**PLAINTIFF DEMANDS A TRIAL
BY JURY**

    Plaintiff MATEO GUERRERO-TABARES (Mr. Guerrero-Tabares; he/him), by and through his attorneys, Gideon Orion Oliver, Cohen&Green P.L.L.C., hereby complains of Defendants as follows:

**PARTIES**

    1.    At all times mentioned herein, Plaintiff MATEO GUERRERO-TABARES is and has been a resident of Queens County in the City, and State of New York.

    2.    At all relevant times mentioned herein, Defendant, City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by the virtue of the laws of the State of New York and acts by and through its agencies, employees, and agents, including (but not limited to) the New York City Police Department ("NYPD") and their employees.

    3.    Defendant NYPD Assistant Chief James McCarthy was at all times relevant to this Complaint a member of the NYPD assigned to the police response on the street during the protest described herein. He is sued individually and in his official capacity.

4.    Defendant NYPD Officer FNU Boyle, Tax Id Number 946802, was at all times relevant to this Complaint a member of the NYPD assigned as the "arresting officer" described herein. He is sued individually and in his official capacity.

5.    The true names of Defendant Does #1-3, as noted throughout this complaint, are currently unknown to Plaintiff, except as follows:

a.    Defendant John Doe 1 appears on video,[1] a still of which is pasted below, as a Black man with short black hair:



b.    Defendants John Doe 2 and 3 appear on video, a still of which is pasted below, arresting Mr. Guerrero, and pressing their weight into his body while Mr. Guerrero lay on the ground.



---

[1] A copy of this video will be sent to counsel for Defendants on request.

6.     At all times hereinafter mentioned, the Defendants were employed by the City of New York as members of the NYPD.

7.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

8.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

9.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

10.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

11.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

12.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no point did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

13.     Each individual Defendant is sued in her or his individual and official capacities.

## JURISDICTION, VENUE, AND GENERAL MUNICIPAL LAW COMPLIANCE

14.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

15.     The federal civil rights claims in this action are brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

16.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57 and 65 authorize this Court to grant Plaintiff the declaratory and injunctive relief she prays for herein.

17.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

18.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

19.     Plaintiff timely served a Notice of Claim on the municipal Defendant and complied with all conditions precedent to commencing an action under state law.

20.     Plaintiff met with Office of the Comptroller to attempt to adjust this claim.

21.     The Office of the Comptroller, upon information and belief because of the involvement of Assistant Chief McCarthy, refused to make any offer to adjust this case.

22.     Plaintiffs has initiated this action within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York State Law

## STATEMENT OF FACTS

23.    Plaintiff Mateo Guerrero is a community organizer who immigrated from Colombia in 2010 and now advocates for transgender and immigrant rights at the non-profit Make The Road New York. City & State New York has named Mr. Guerrero among the "Pride Power 100" for the past three years in a row, and in March 2024, Mr. Guerrero received a proclamation from the Office of Governor Kathy Hochul.

24.    In addition to providing services to queer and gender-diverse people in New York City, Mr. Guerrero leads engagement in lobbying efforts for state and local legislative campaigns on trans and immigrant justice. He also runs Make the Road's Leadership School, designing educational sessions for community members about advocacy tactics, public speaking, and social movement history. Since 2018, Mr. Guerrero has taught "Spanish for Lawyers" as an adjunct professor at the NYU School of Law.

25.    On May 24, 2023, at or around 5 p.m., Mr. Guerrero arrived at Foley Square to participate in a peaceful protest march with an NYPD escort.

26.    Mr. Guerrero was participating as a member of the Care Not Criminalization March Security Team, marching to protest City budget cuts on schools, public libraries, and health access.

27.    Around 6:30 p.m., NYPD members detained and arrested Mr. Guerrero without consent, probable cause, or lawful justification, and used unreasonable and excessive physical force in arresting him.

28.    Mr. Guerrero was walking with the walk sign through the intersection of Broadway and Murray Street when Assistant Chief McCarthy (Tax ID No. 885671) told him to get out of the way.

29.    Defendant McCarthy then suddenly lifted Mr. Guerrero and threw him down onto his back.

30. Mr. Guerrero stood back up, and Defendant McCarthy directed other NYPD members to arrest him.

31. Other NYPD members, including upon information and belief John Does 1-3 then attacked Mr. Guerrero, hitting him in the back of his neck and forcefully taking him to the ground, where he fell onto his right shoulder.

32. At least two NYPD members — John Does 2 and 3 -- used the weight of their bodies to pin Mr. Guerrero to the ground and then pulled Mr. Guerrero's hands behind his back to handcuff him. Videos of the arrest show multiple NYPD officers kneeling on top of Mr. Guerrero to violently pin him face-down. One of John Does 2 and 3 twisted Mr. Guerrero's left arm behind him, and the other twisted his right arm.

33. Mr. Guerrero repeated multiple times that he was not resisting arrest.

34. But the officers continued to painfully twist his arms as they put on metal handcuffs with extreme tightness.

35. The NYPD members then forcefully pulled Mr. Guerrero up.

36. An NYPD member threaded his arm through Mr. Guerrero's arms, which were bound behind his back, and pressed down, unnaturally elevating Mr. Guerrero's shoulder.

37. Mr. Guerrero asked the NYPD member to change positions because he was causing extreme pain in Mr. Guerrero's shoulder, but the officer did not take any steps to alleviate the pain until after Mr. Guerrero was forced to endure the painful hold for an extended period of time.

38. The NYPD members then loaded Mr. Guerrero into a prisoner transport vehicle. At the back of the vehicle, upon information and belief, Defendant McCarthy tried to assign Mr. Guerrero's arrest to Officer Black for processing. Officer Black told Defendant McCarthy in substance that he had not seen Mr. Guerrero obstruct any traffic prior to his arrest.

39.     The prisoner transport vehicle brought Mr. Guerrero to a centralized processing location at the NYPD's 7th Precinct.

40.     Because NYPD members had arrested Mr. Guerrero at a protest, NYPD members at the 7th Precinct subjected Mr. Guerrero to an unreasonable and lengthy large-scale arrest process.

41.     The NYPD members unlawfully searched Mr. Guerrero's person.

42.     At the 7th Precinct, Mr. Guerrero repeatedly asked NYPD members to release his excessively tight metal handcuffs, which were causing severe pain to his wrists and shoulders.

43.     The pain caused Mr. Guerrero to fall forward multiple times.

44.     The NYPD members that Mr. Guerrero complained to denied his request.

45.     Mr. Guerrero then asked the NYPD members to move his handcuffs from the back of his body to the front, in order to release some of the tension in his right shoulder. The NYPD members denied this request as well.

46.     Mr. Guerrero was forced to endure the excessively tight handcuffs for about an hour at the 7th Precinct before he was brought to a holding cell and his handcuffs were removed.

47.     Later that evening, Sgt. Boyle (Tax ID No. 946802) issued two C-Summonses to Mr. Guerrero and released him from custody. Those C-Summonses (Summons Nos. 4446999743 and 4446999730) charge Mr. Guerrero with violating New York Vehicle and Traffic Law 1156(a) and New York Penal Law 240.20(5).

48.     Upon information and belief, these summonses relied on fabricated evidence about purported observations of Mr. Guerrero's alleged pre-arrest conduct.

49.    The resulting criminal proceedings against Mr. Guerrero were adjourned in contemplation of dismissal on June 12, 2023.

50.    Mr. Guerrero immediately sought medical attention for his physical injuries upon his release from the 7th Precinct.

51.    He went directly to a CityMD, where he was examined for a bruise on his left shoulder and lacerations on his left forearm, his left pectoral, the back of his neck, his right clavicle, and his right elbow. Mr. Guerrero was also experiencing pain in his right shoulder and in and around his wrists.

52.    At the CityMD, Mr. Guerrero received a sling for his right arm, which he wore for the rest of the day and the next day.

53.    Mr. Guerrero also suffered emotional harm from the incident on May 24th.

54.    Mr. Guerrero missed two days of work as he recovered from his physical and emotional injuries.

## OTHER DOCUMENTS AND FACTS PLAINTIFF INCORPORATES BY REFERENCE

55.    Plaintiff incorporates by reference the facts contained in the reports that have been issued concerning Defendants' responses to the summer 2020 protests, including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[2]

---

[2] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

56.    Plaintiff incorporates by reference the factual allegations in other federal civil rights complaints in cases in the United States District Court for the Southern District of New York arising from Defendants' responses to the summer 2020 protests, that have since settled, including:

   a.  Sow et al v. City of New York et al, 20-cv-00533(CM)(GWG);

   b.  People of the State of New York v. City Of New York et al, 21-cv-322 (CM)(GWG);

   c.  Payne et al v. De Blasio et al, 20-cv-8924 (CM)(GWG);

   d.  Sierra et al v. City of New York et al, 20-cv-10291 (CM)(GWG);

   e.  *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

   f.  Yates v. City of New York, et al., 21-cv-01904 (CM)(GWG);

   g.  Campbell v. City of New York, 21-cv-04056 (AJN); and

   h.  Gray, et al., v. City of New York, et al., 21-cv-06610 (CM)(GWG).

## THE NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE AND OTHER, SIMILAR DEMONSTRATIONS

57.    The NYPD's violent response to the counter protest against anti-abortion protests that the plaintiffs participated in was dramatically different from their response to other kinds of protests and rallies.

58.    On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[3]

---

[3] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

59.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[4]

60.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[5]

61.     On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[6]

62.     On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of

---

[4] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.
[5] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.
[6] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her, and police threw her to the ground.[7]

63.     On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[8],[9]

64.      In fact, on the same date and at the same location as the arrest of the Plaintiffs, individuals associated with the Red Rose Rescue, a group identified by the New York State Attorney General as a "Militant Anti-Abortion Group" that invades clinics and blocks access to reproductive health, were also present at participating in the march and protest activity.[10]

65.     However, on the date of the Plaintiffs' arrests the NYPD acted in a manner favoring those associated with the Red Rose Rescue group and treated them more favorably than they treated Plaintiffs.

66.     The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.  By way of non-exhaustive example:

   a.  In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

   b.  In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor

---

[7] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[8] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[9] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[10] https://ag.ny.gov/press-release/2023/attorney-general-james-sues-militant-anti-abortion-group-invading-clinics-and , NYSAG announcing a lawsuit being filed against the Red Rose Rescue seeking to bar them from coming within 30 feet of any reproductive health care facility in New York State

Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[11],[12]

c.  More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[13] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[14]

## THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS

67.  The extensive deprivations of constitutional rights suffered by Plaintiffs here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, inter alia, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

68.  The NYPD response to the protest of the anti-abortion demonstration was in line with its history of violent and unconstitutional responses to past protests challenging police

---

[11] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[12] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

[13] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video

[14] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

69.     For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, and use of pepper spray.[15]

70.     The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests, and excessive and unreasonable detention.[16]

71.     The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[17]

72.     Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers.[18]

73.     Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

74.     Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has the Plaintiff in this case.

---

[15] *See,* e.g., N.Y. Civil Liberties Union, Arresting Protest (2003), available at
https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[16] *See,* e.g., N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at
https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[17] *See,* e.g., Callaghan v. City of New York, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[18] *See* People of the State of New York v. City of New York et al., 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

75.     In many of these cases Defendants employed tactics developed and modified over the course of many years by former Commissioner Shea, former Chief Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a.   *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

b.   *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

c.   *Haus v. City of New York*, 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." See also *Larsen v. City of New York, et al*., 04-cv-0665 (RWS) (S.D.N.Y.);

d.   *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as using extremely tight plastic handcuffs in their arrest;

e.   *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS)

(S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller,* No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia,* "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler,* No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

f.   Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[19] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Peat et al v. City of New York, 12-cv-8230 (SAS)(HBP)* that included offers of judgment and attorney fees totaling $598,028, and which complaint had a similar failure to train Monell claim; *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions; and *Packard et al v. City of New York*, 15-cv-7130 (SDNY(AT)(SDA) that settled for a total payout including attorney fees of $980,000, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions.

g.   Other OWS-related cases have continued through discovery involving failure to train claims similar and/or identical to those at issue in this case, which are currently scheduled for trial, including *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

h.   The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, unnecessary and excessive force used on

---

[19] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC,* 12-cv-7165(RWS); *Dierken v. NYC,* 12-cv-7462(RWS); *Elliot v. NYC,* 12-cv-992(RWS); and *Hanlin v. NYC,* 12-cv-5844(RWS);

i.  Those OWS-related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well as several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

j.  The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

k.  The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

l.  The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

m.  *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

**THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING**

76.  Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

77. In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

78. In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

79. Upon information and belief, to this day, that document forms the core of the NYPD protest response-related training.

80. The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

81. Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

82. These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Plaintiff in this case.

83. Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

84. However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

85.     On information and belief, there was, and is, virtually no NYPD training—and certainly no meaningful NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

86.     Defendants' failures to train, which led to violations of Plaintiff's rights in this case, include, inter alia, the following:

    a. The failure to train, instruct, and discipline officers to discourage and prevent misconduct and assault by NYPD members;

    b. The failure to make clear the need to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

    c. The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies; and

    d. The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters.

87.      Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

88.     The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

89.    The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

90.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."20

91.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the George Floyd protests, and the anti-abortion counter protests from the present lawsuit.

92.    Many SRG members, including those deployed to the protest in this case, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.21

93.    SRG members are meant to have additional DCU training.

94.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

95.    However, the City of New York has admitted that many of the officers deployed to respond to protests did not even receive that training, which was supposedly required of them.

96.    As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protest was limited to what they had received as recruits in the Academy.22

---

20 Ben Yakas, NYPD: Fine, Maybe We Won't Police Protests With Machine Guns, Gothamist, Jan. 30, 2015, available at https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.

21 Ali Winston, NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories, The Appeal, Oct. 15, 2020, available at https://theappeal.org/nypd-srg-misconduct.

22 New York City Law Department, Corporation Counsel Report (Dec. 2020) ("OCC Report"),

97.     Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with disperse and demoralize while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

98.     Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

99.     For example, in a March 17, 2006 New York Times article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, Allen v. City of New York, 03-cv-2829 (KMW) (GWG) (SDNY).23

100.    Those reports praised employing militarized tactics to reach the goal of disperse and demoralize, such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of

---

https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf at page 37.
23 Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

"proactive" arrests, like the Plaintiffs arrests on December 3, 2022, in order to have a "powerful psychological effect" on protesters.

101.    After the 2002 WEF after-action reports were disclosed in Allen and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

102.    For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

103.    Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with First Amendment assemblies. These internal reports include Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

104.    Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

105. For example, in a deposition in Packard v. City of New York, 15-cv-7130 (S.D.N.Y.) (AT), a FRCP 30(b)(6) witness testifying as the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

106. As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

107. For example, in a 2017 FRCP 30(b)(6) deposition on (i) sidewalk policy protesting, (ii) dispersal orders, and (iii) training on probable cause standards for protest arrests, Defendant City of New York could identify any impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training related to protest policing.

108. Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[24]

109. At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates both a history and

---

[24] OCC Report at 2, 30.

a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and

other, related rights of Plaintiff and other similarly injured protesters.

### THE NYPD'S POLICY AND/OR PRACTICE OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS

110.    Defendants used types and levels of force that were excessive and unnecessary

force against Plaintiff.

111.    The uses of force against Plaintiff were in contravention of, or inconsistent with,

related, written NYPD policies and/or training.

112.    However, that use of force was consistent with and ratified within the unwritten

policies of the NYPD.

113.    In "Police Use of Force in New York City: Findings and Recommendations on

NYPD's Policies and Practices," an October 1, 2015 report published by the New York City

Department of Investigation Office of the Inspector General for the NYPD ("OIG-NYPD")[25], the

OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies,

including, *inter alia*, that:

  a. NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;

  b. NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;

  c. NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;

  d. NYPD training does not adequately focus on de-escalation; and

---

[25]    "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," New York City Department of Investigation, Office of the Inspector General for the NYPD (October 1, 2015), *available at* http://www1.nyc.gov/site/oignypd/reports/reports.page ("OIG-NYPD Report") (last accessed April 1, 2022).

e.  In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force.

OIG-NYPD Report at pp. 3-5.

114.    After October 1, 2015, the NYPD revised its Patrol Guide provisions, and designed, created, and implemented training, to include "updated definitions concerning force, new policies regarding de-escalation, responsibilities of witness officers in use of force incidents, reporting obligations concerning force incidents, and data analysis on use of force incidents". *See* OIG-NYPD Report at p. 2 *et seq*.; *see also* NYPD Patrol Guide Section 221-01[26] ("Force Guidelines") and 221-02[27] ("Use of Force"), issued and effective June 27, 2016 (implementing changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

115.    Under those revised NYPD written policies and procedures, NYPD members who use force are required to file written Threat, Resistance, and Injury ("TRI") reports when they use certain force, including, but not limited to, hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), and/or force that causes physical injuries, including bruising or swelling and the like. And supervisors are also required to conduct investigations and fill out TRI reports related to such uses of force.[28]

---

[26]    Available online via the New York City Civilian Complaint Review Board ("CCRB") website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-01-force-guidelines.pdf.

[27]    Available online via the New York City Civilian Complaint Review Board website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-02-use-of-force.pdf.

[28]    "Use of Force: Revised NYPD Policy," NYPD Use of Force Update- June 2016 (June 2016), at pp. 4-5, *available at* https://www.prisonlegalnews.org/media/publications/Use%20of%20Force%20-%20Revised%20NYPD%20Policy%20Booklet,%20NYPD,%202016.pdf ("NYPD Use of Force Update") (last accessed April 1, 2022) (footnotes omitted).

116.    Defendants failed to document, and/or require that fellow Defendants and/or other fellow NYPD members document and failed to investigate and/or supervise fellow NYPD members regarding, uses of force in accordance with related NYPD policies and/or training.

117.    Moreover, the City ratified the specific conduct here by declining to make even a nuisance value adjustment to the claim, upon information and belief because of the involvement of Assistant Chief McCarthy.

118.    That is, the City's monetary policy, upon information and belief, is to refuse to settle cases for obvious misconduct by high-ranking members of the NYPD, in order to personally protect those members.

119.    The City maintains this approach despite its obvious monetary costs and long term economic irrationality.

120.    That is part of, as alleged above, a broader policy of "failing upwards," where those engaged in the worst misconduct, particularly at protests focused on police misconduct, are not just not disciplined, but are rewarded for that conduct.

121.    As it happened in this case, those rewards include not settling cases that name those officers, to stall out as long as possible any settlement or verdict becoming part of that officer's history.

122.    Defendant City, by doing that, ratified the conduct of Defendant McCarthy.

123.    Defendants used force that they knew, or should have known, would negatively impact Plaintiff, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

## FIRST CLAIM FOR RELIEF

**Unlawful Seizure / False Arrest**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under
the Fourth and Fourteenth Amendments to the United States Constitution***

124.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

125.    Defendants' seizure of the Plaintiff herein was done without any judicial warrant authorizing them to seize Plaintiff, was unreasonable, and was done without privilege or lawful justification.

126.    Plaintiff did not consent and was conscious of her confinement by Defendants.

127.    Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

128.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

129.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

**Excessive Force**
***Pursuant to 42 U.S.C.§1983 for Defendants' Violations of Plaintiff's Rights Under the
Fourth and Fourteenth Amendments to the United States Constitution***

130.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

131.    Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

132.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

133.    The illegal conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

**First Amendment**
***Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

134.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

135.    Defendants imposed restrictions on protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in unlawfully seizing Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, in subjecting Plaintiff to Defendants' protest policing policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

136.    The Defendants' retaliatory restrictions Plaintiff complains of herein imposed upon Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment in public were themselves regulations on Plaintiff's protected conduct that:

    a.  Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental

interests, and/or were not the least restrictive means readily available to serve those interests; or,

b.   Were content-neutral but nonetheless lacked sufficiently narrow tailoring to serve a significant governmental interest in that the restrictions substantially burdened more protected speech and/or conduct than was necessary to serve those interests, and/or failed to adequately provide alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened or limited; and/or

c.   Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.   Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

137.   As a result of the Defendants' acts and omissions, Plaintiff was deprived of his federal, state, and/or other legal rights; caused bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused to expend costs and expenses; and/or otherwise was damaged and injured.

138.   The illegal conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### First Amendment Retaliation
***Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

139.   Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

140.   Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

141.   Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

142.    Defendants engaged in the acts and omissions complained of herein in an effort to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

143.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

144.    Additionally, as discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of her First Amendment rights.

145.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

146.    Upon information and belief, Defendants engaged in the acts and omissions described herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

147.    Additionally, as discussed herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in detaining and assaulting Plaintiff subjected Plaintiff to the violations of their First Amendment rights described elsewhere herein.

148.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

149.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Due Process
### *Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the Fifth and Fourteenth Amendments to the United States Constitution*

150.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

151.    As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiff violated her Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

152.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those individual Defendants who ordered, effected, and otherwise participated in seizing Plaintiff and subjected Plaintiff to the violations of her Due Process rights described elsewhere herein.

153.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of her federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

154.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Equal Protection and Selective Enforcement
***Pursuant to 42 U.S.C §1983 for Defendants' Violations of Plaintiff's Rights Under the Fourteenth Amendments to the United States Constitution***

155.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

156.    Further, Defendant McCarthy's dislike for protestors is well documented. Most recently in May 2020, a CCRB complaint against McCarthy was substantiated for excessive use of force by means of pepper spray against civilians at a protest during the summer of 2020.[29]

157.    Defendant McCarthy was also named in a 2009 lawsuit in the Southern District of New York related to protests of the Republican National Convention, where tens of protestors were unlawfully arrested en masse and subjected to unreasonable and lengthy NYPD large-scale arrest processing.[30] That suit was settled for nearly $18 million. [31]

158.    As discussed herein, Defendant City, through officials including Defendant McCarthy, designed and/or implemented policies and practices pursuant to which those individual Defendants who ordered, effected, and otherwise participated in detaining Plaintiff thus subjected Plaintiff to the above-described violations of Plaintiff's Equal Protection rights.

159.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering,

---

[29] https://www.documentcloud.org/documents/23741501-202003712_redactedclosingreport_redacted

[30] *Biddle et al v. The City of New York et al.*
[31] https://www.nyclu.org/press-release/victory-unlawful-mass-arrest-during-2004-rnc-largest-protest-settlement-history

psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and

expenses; and/or otherwise damaged and injured Plaintiff.

160.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or

reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

### Municipal Liability
### Pursuant to 42 U.S.C §1983 and _Monell v. Department of Social Services_, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution

161.    Plaintiff incorporates by reference all the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

162.    The facts as pleaded above describe the policies, practices, and customs Defendants

subjected the Plaintiff to, including, but not limited to: uses of excessive force, and sexual battery,

and unlawful detention, and unreasonable restrictions on protesters' First Amendment-protected

conduct, often without fair warning; employing crowd control tactics such as pushing, corralling,

encircling, or otherwise trapping protesters, without fair warning; engaging in retaliatory and

selective enforcement of the criminal laws against perceived participants in First Amendment

assemblies lacking adequately clear standards to guide police officials' extremely broad discretion

to arrest anyone at their whim, based on _ad hoc_ determinations as to their perceived violations,

without fair warning.

163.    All of the wrongful acts or omissions complained of herein were carried out by the

individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules,

and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking

agents including but not limited to Defendant McCarthy, Defendant Boyle; Defendant Black, and

Defendant NYPD members John and Jane Does 1-3; (c) customs, practices, and usage of the

NYPD that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein; and (e) Defendant City's ratification of the actions of NYPD members, including especially Defendant McCarthy.

## **EIGHTH CLAIM FOR RELIEF**

### *42 U.S.C. § 1983 False Arrest and Deprivation of Freedom Claim Against the Individual Defendants*

164.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

165.    The individual Defendants willfully and intentionally seized, searched, detained, and arrested Plaintiff, and caused him to be imprisoned, without probable cause, and without a reasonable basis to believe such cause existed.

166.    Plaintiff had not been engaged in any unlawful, violent, or criminal conduct, nor was he engaged in any behavior or conduct which could reasonably be viewed as such nor a basis to justify her arrest.

167.    Regardless of the lack of sufficient legal cause, Plaintiff was arrested and detained in the Defendants' custody.

168.    In so doing, the individual Defendants falsely arrested and imprisoned Plaintiff, and thereby violated and aided and abetted in the violation of Plaintiff's rights under the Fourth Amendment of the United States Constitution.

169.    By reason thereof, the individual Defendants have violated 42 U.S.C §1983 and caused Plaintiff to suffer the deprivation of his individual liberty, the loss of the rights conferred to him under the United States Constitution, physical injuries, and mental and emotional anguish.

### NINTH CLAIM FOR RELIEF

**N.Y.C. Admin. C. §§8-801 *et seq.*, "Qualified Immunity Repeal" Claims Against All Defendants**

170.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

171.    The New York City Administrative Code §8-803 provides as follows in relevant part:

> a.  "A covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable to the person aggrieved for legal or equitable relief or any other appropriate relief."

> b.  "The employer of a covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable, based upon the conduct of such covered individual, to the person aggrieved for legal or equitable relief or any other appropriate relief."

> c.  "A person aggrieved may make a claim pursuant to subdivision a of this section in a civil action in any court of competent jurisdiction by filing a complaint setting forth facts pertaining to the deprivation of any right created, granted or protected by section 8-802 and requesting such relief as such person aggrieved considers necessary to insure the full enjoyment of such right."

172.    Given the fact that a "covered individual" under §8-801 means "[any] employee of the police department," the Individual Defendants are all considered covered individuals. §8-801.

173.    Plaintiff is a "person aggrieved" because he was (at minimum) "allegedly subjected to, or allegedly caused to be subjected to, the deprivation of a right created, granted, or protected

by §8-802 by a covered individual even if the only injury allegedly suffered by such natural person is the deprivation of such right." *Id.*

174.    Defendant City is liable as an employer, as set out above.

175.    Defendants' uses of force against Plaintiff were unjustified, unlawful, and objectively unreasonable, considering the facts and circumstances before the Defendants.

176.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of Plaintiff's federal, state, and/or other legal rights; caused Plaintiff's bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

177.    Further, it is not a defense to liability under §§8-801 *et seq.* that a covered individual has qualified immunity or any other substantially equivalent immunity.

178.    Thus, the Court should award both compensatory and punitive damages against all parties (including the City), an order restraining future conduct, and all reasonable fees and court expenses pursuant to §8-805 of the Administrative Code.

## TENTH CLAIM FOR RELIEF

**Violations of New York State Law**
***Pursuant to the New York State Constitution and New York State Common Law***

179.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

180.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

## Violations of the New York State Constitution

181.    Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

182.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

## Assault and Battery

183.    Defendants committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

184.    Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

185.    Defendants did thereby inflict assault and battery upon the Plaintiff.

## False Arrest, False Imprisonment, and Unreasonable Detention

186.    In performing the actions and behaviors described above, the Defendants did falsely detain Plaintiff within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiff additionally was conscious of the confinement and was confined without his consent.

## Intentional and Negligent Infliction of Emotional Distress

187.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

188.    In performing the actions and behaviors described above, Defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff.

189.    The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to the Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

190.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

191.    The conduct of officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and law enforcement officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

## JURY DEMAND

192.    Plaintiff requests a jury trial on all issues capable of being tried and determined by a jury pursuant to Fed. R. Civ. P. 38.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of New York as follows:

i.    Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.    Actual damages in an amount to be determined at trial against the City of New York, and punitive damages pursuant to N.Y.C. Admin. C. § 8-805(1)(ii);

iii.    An appropriate restraining order pursuant to N.Y.C. Admin. C. § 8-805(3)

iv.    Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. § 1988, N.Y.C. Admin. L. § 8-805(2), and New York common law; and

v.    Such other relief as the Court deems just and proper.

Dated: Queens, New York
        August 20, 2024

**COHEN&GREEN P.L.L.C.**

By:_____/s/_____
        J. Remy Green
        Elena L. Cohen

 1639 Centre Street, Suite 216
 Ridgewood, NY 11385
 (929) 888-9480
 elena@femmelaw.com
 remy@femmelaw.com

**GIDEON ORION OLIVER**

_____
277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

*Attorneys for Plaintiff*